[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. The Dissolution of the Marriage
It is found that all of the allegations of plaintiff's complaint have been proven, that the marriage has broken down irretrievably, and the marriage is ordered dissolved for that reason. CT Page 4233
II. The Marital Estate of the Parties Plaintiff (Wife)
 One half interest in No. 3 Westridge Drive Simsbury, CT
 Total Value $192,500 Less Mortgage — 176,861 -------- Total Equity $ 15,639 One Half Interest $ 7,820 $ 7,820
 1994 Ford Explorer (leased) — Household furniture and furnishings — Fleet partnership account 22 Two custodial accounts for children — ($5,000 C.D. each) — Galaxy Fund 2,044
 Life Insurance Works Ins. F.V. 15,000 C.S.V. 0 — Life Insurance Mass. Mutual F.V. 25,000 C.S.V. 3,000 3,000 Pershing Keough; Robt Livingston, Tr'ee 37,333 --------- Total $50,219
 Defendant (Husband)
 One half interest in No. 3 Westridge Drive Simsbury, CT (see calculation above) $ 7,819 Household furniture and furnishings, tools — Nations Bank C/A 1,500 Life Insurance Mass. Mutual F.V. — $500,000 C.S.V. 0 Life Insurance Principal F.V. 25,000 C.S.V. 0 401K Apex Data 22,500 I.R.A. $ 11,951 ---------- Sub Total $ 43,770
 Plus stock option rights (see finding in Article 111E) Total Marital Estate $93,989 + Stock Options CT Page 4234
III. The Evaluation of the Evidence in Accordance with theProvision of Sec. 46b-81c C.G.S.
A. General Background Information
The plaintiff wife and the defendant husband, both of whom are 38 years of age, were married on October 10, 1981, fourteen and one half years ago. The plaintiff, who is a registered nurse, had previously completed a three year course at the Mary Hitchcock School of Nursing in Hanover, New Hampshire while defendant had received his degree from nearby Dartmouth College in 1980. At the time of their marriage both parties were employed, plaintiff as a nurse and defendant as a trainee at Bethlehem Steel Corporation. Thereafter they moved to and remained at Grand Rapids, Michigan for two years while plaintiff continued working part time as a nurse and defendant as an employee of Bethlehem Steel. Plaintiff ceased work in late 1983 when she became pregnant. The following year defendant was transferred by his employer to Johnstown, Pennsylvania, where the parties remained for two years. In the interim, on May 1, 1984, a son, Colin, was born. In 1986 the parties began a two year residence in York, Pennsylvania, where defendant was employed by Seneca Wire Co. A daughter, Lauren, was born on August 19, 1987.
During this period the parties formed a company known as the Commercial Mortgage Network, financing its beginning with $5,000 in family assets, $15,000 in a loan from plaintiff's parents and $15,000 from a second mortgage on a house they had purchased. The parties had hoped that the company would ultimately be sufficiently successful to permit a public offering of its stock. A severe stock market collapse in October, 1987 ended all such plans. The business was closed, multiple tag sales were held, the family house was sold, all debts were paid, and the parties moved to West Hartford, Connecticut where, until November 1989 they remained rent free in accommodations provided by plaintiff's parents.
In 1989 the parties purchased their present house in Simsbury, Connecticut. Defendant at the time was commuting daily to his employment in White Plains, New York where he was vice president of sales and marketing while plaintiff was working part time as a nurse in her father's office. In 1991 defendant began a one and one half year stint with Piiceon, a California based company which manufactured hardware for computers. In the summer CT Page 4235 of 1992 he began a significant association with another California corporation known as Apex, one of the first concerns to provide a fax modem for computers. His relationship with this and other related companies in this field has ignited the most troublesome issue and the greatest controversy in this litigation; its ramifications will be dealt with more fully anon. The parties separated during the second week of October, 1993 at which time defendant moved to the Atlanta, Georgia area without changing his employment. At that time both children remained with plaintiff. In October, 1994 son Colin, who had meanwhile developed emotional problems, was moved to Georgia to be with his father. This arrangement continues to the present time.
Both parties appear to be in reasonably good health.
B. The Present Income of the Parties
Plaintiff presently is employed as office manager for her father, a practicing physician. Her gross weekly income, as reflected in her most recent financial affidavit, is $536 with a weekly net after the usual deductions of $443.
Defendant in turn is currently the director/DEM of sales for Smart Modular Technologies with his office in Atlanta, Georgia. His current financial affidavit indicates he has a gross weekly income of $1,347 together with an additional weekly gross from commissions and a bonus of $1,066 for a gross weekly total of $2,413. His total weekly net income from these various sources after the customary deductions is represented by him to be $1,875.
C. Fault
As in most contested dissolution matters, the parties differ as to the reasons for the breakdown of their marriage. Because of their widely disparate views regarding the distribution of the marital estate, the court deems it helpful here to relate in more detail than is customary their sentiments concerning their marital problems. By doing this the flavor and tone of the marriage may be revealed and the solution to a vexatious issue may well be simplified if not resolved.
Plaintiff
Plaintiff began her testimony on this factor by stating that CT Page 4236 the marriage had broken down because (1) things had to be done his way; (2) for the past few years he had an affair; (3) he was often angry and made threats to her at home; and (4) stress appeared in the children. She elaborated by stating "I realized it had to end. He was mean to us. It wasn't just the affair. He was away on holidays, on Mother's Day. He would call, tell me he needed time to think and be away for three days. At Christmas time in 1992 he told me that maybe there was someone else but refused to tell me her name. Prior to this I had asked him multiple times why he was so cold. For the next ten months after this he would have nothing to do with me. During this period we would never have a meal together. He would go into his office for phone calls. If I answered the caller would hang up and immediately call back. This went on for many months. During the ten month period prior to our separation I discussed counselling with him many times. I told him our marriage was important, that we had children. During this period the children were nervous, high strung, wanted to know where their father was. He wouldn't call when he was away on business; when I asked him if I could cut back on my work he refused to allow it, stating that we needed the money. I stayed at work at his insistence."
Plaintiff at this point digressed to mention briefly that defendant had had a problem with alcohol, had been arrested for driving while intoxicated in Georgia in the summer of 1992, and on occasion would call her on his car phone while intoxicated, all of which caused her great consternation.
Plaintiff concluded by testifying that in early October, 1993 defendant told her that he would try to make their marriage work and that he'd be home for their wedding anniversary on October 10. Defendant later called her, said it wouldn't work and failed to appear as promised. Plaintiff ended by stating that she then realized that the parties could never reunite, and that when he finally returned she requested that he leave the family home. Defendant complied with the request, moving to leased quarters in Georgia which he shared with his girlfriend and her child. At this juncture the court notes defendant's testimony that he had discussed living arrangements with his girlfriend two months before we signed the lease.
It should be noted at this point that following the separation both children remained with plaintiff. Subsequently the defendant began calling son Colin, then about 10 years of age. Colin longed for his father, started acting up at home, CT Page 4237 scratched his younger sister's face, said he's like to be with his father and by agreement of the parties was moved to his father's home in Georgia where he presently resides.
Defendant
Defendant's testimony on this subject was not as protracted as that of plaintiff. His opening remark was that plaintiff was incapable of doing anything on her own behalf. Continuing, he testified that "the marriage was over two years before I left in October, 1993. There were trials and tribulations before this. We had difficulties from the onset. She was of little assistance." In response to the question whether he could say anything good about his wife he replied "She was a decent mother." Later he stated that "my marriage broke down from an accumulation of events about 1991. I believed there was no point in continuing. She was completely dependent upon me. I tried to supply a comfortable environment for our family. She complained about my working hours and being away, but liked the financial benefits that accrued from this. It all really began in 1988 with the move to Connecticut. I felt in many respects I had three children. In mid 1991 I was no longer in love with her. We had two different objectives in our lives. She wanted me home most of the time, but was very comfortable with the standard of living we were able to achieve. Between 1991 and 1993 I cooked, bought groceries, cared for the children, took them to school, picked them up."
In explaining his relationship with his girlfriend, defendant testified as follows: "I first met Angie Gerry in December, 1991. She worked for a customer of mine in California. Fifteen months later I became emotionally and sexually involved with her. She was not a factor in the breakdown of my marriage. The situation at home was intolerable, but because of the children I didn't know how to leave. At Christmas time in 1992 I told her that I had developed some sort of feeling for another woman." Other testimony by defendant reveals that his feelings toward his girlfriend had reached a sexual level in the early months of 1993.
On another point defendant admitted that he never thought much of counselling and that "I always tried to resolve issued of conflict internally. I didn't think (plaintiff) would change."
In describing the several months preceding the final separation of the parties, defendant remarked that "there was CT Page 4238 increased tension between her and me. It was very stressful. I was involved in a new business venture, and I needed her help at home. She complained about my working at night at home, that I didn't take time off for vacations, that we had no time together without the children."
Defendant described the final separation as "an emotional situation. She wanted me to leave. She couldn't deal with the uncertainty. We were both crying. I got together a couple of bags of clothes and left immediately." Defendant was served with divorce papers less than a month thereafter.
Defendant's concluding thought on this factor was that "fault should be shared equally by both of us."
Conclusion
After examining all of the evidence and weighing the testimony of the parties, the court finds that responsibility for the irretrievable breakdown of the marriage of the parties rests with defendant.
D. Future Opportunity
While each of the parties is believed to have reached a similar level of skill in his or her employment, plaintiff as a nurse and defendant as a director of sales for a successful company, the similarity ends at the point. The defendant on the evidence has a far greater opportunity than does plaintiff for the future acquisition of capital assets and income.
 E. The Contribution of Each of the Parties in the Acquisition, Preservation or Appreciation in Value of Their Respective Estates
This last factor to be considered before the court makes an assignment of the marital estate has precipitated first and foremost more lengthy argument and even more lengthy briefs than all others combined. At issue in brief is whether the court should accept defendant's argument that certain stock options or rights acquired by him subsequent to his separation from plaintiff should, because of the lack of contribution on plaintiff's part to their acquisition, preservation or increase in value, be therefore determined to belong solely to him to the total exclusion of the plaintiff. CT Page 4239
A brief statement of the sometimes confusing facts surrounding this controversy is in order:
In July, 1992, while the parties were still together, defendant commenced employment as eastern regional sales manager with Apex Data, Inc. of California, a corporation which manufactured and sold supplies for computers. Included in the terms of his employment was the right or option to purchase 800,000 shares of common stock in the company over a period of four years, ending in July, 1996. In March, 1994 defendant executed to his employer his promissory note in the amount of $60,000 with interest at the rate of 6.5%, per annum, the money to be used in the event defendant in the future decided to exercise his option. On January 5, 1995 Apex merged with Cozimel Funding, Inc. of Delaware, the new company formed from this alliance being known as Apex Data Inc. of Delaware. A second merger occurred on July 28, 1995 with the resulting company being known as Smart Modular Technologies, Inc. of Delaware. Still later through various processes the company came to be known as Smart Modular Technologies, Inc. of California, the present employer of defendant. The stock in this company "went public" on November 16, 1995. In conjunction with this event defendant had, in a "lock-up" agreement with his employer executed on September 15, 1995, contracted not to sell or assign any of his stock rights or options for a period of 180 days after the initial public offering of the company stock. Stock in this company at the close of trial on April 11, 1996 was selling at $17.50 per share. It should be noted that defendant's option continued in one form or another throughout the various mergers and acquisitions.
Defendant has the right to purchase at this time 75% of 72,832 shares of company stock and the remaining balance of 25% on July 1, 1996. The fair market value of stock presently available for option is $955,920 and, by way of general information, 100% of the stock options, if exercised on July 1, 1996 would have a present value of $1,274,560. Defendant's note for $60,000, on which there is accrued interest, would be used to purchase all of these shares.
Defendant's position with regard to these options briefly stated is as follows: "My stock rights in Apex had no value at the time of the separation. All of the value of my stock options accrued after the separation." He explained his contribution to CT Page 4240 the various mergers as being the development of additional and alternate channels of distribution for technically oriented company products and the establishment of relationships with customers in need of them. He concluded his testimony on this subject by stating that plaintiff had made no contribution of any nature to his acquisition of these stock options and requested that the court not grant her any share in them.
Plaintiff in her written request to the court for relief has proposed that the stock rights be divided equally between the parties.
Conclusion
Reaching a solution to this problem step by step, the court notes the following well established rules of family law, i.e.:
1. "Marital assets are valued as of the date of dissolution rather than as of the date of an earlier separation." Roach v.Roach 20 Conn. App. 500, 508 (1990). Zern v. Zern 15 Conn. App. 292,296 (1988).
2. "In assigning marital property the court must consider all of the provisions of Sec. 46b-81c C.G.S. Krause v. Krause189 Conn. 570, 571 (1983) (emphasis added).
3. "The court is not required to give equal weight to all of the factors in Sec. 46b-81c C.G.S. nor must it recite in its decision the amount of consideration given to each of them.Totalo v. Totalo 187 Conn. 249, 251-2 (1982).
4. The `contribution of the parties' factor in Sec. 46b-81c C.G.S. includes non-monetary as well as monetary contributions. Such housewifely duties as housework and the care of children should also be considered." Blake v. Blake 207 Conn. 217, 230-232
(1988). O'Neill v. O'Neill 13 Conn. App. 300, 308-312 (1988).
In utilizing these useful legal tools, the court observes that for about a year after defendant left the family home in Simsbury and began sharing his new residence in Georgia with his girlfriend and her child, plaintiff continued not only her housewifely and caretaking duties, but also her employment as a nurse. It was only after their son Colin became emotionally upset with his father's absence did the parties agree that he reside with defendant. At the present time plaintiff and her daughter CT Page 4241 continue their family routine in Simbsury while defendant and son Colin live in Georgia. Defendant and his girlfriend no longer are together.
Both in his briefs and in oral argument defendant gives great weight to the holding of the Appellate Court in the matter ofPapageorge v. Papageorge, 12 Conn. App. App. 596, 599-600 (1987). There, however, the parties had been separated for twenty four years and the bulk of the husband's assets had been acquired during that period. This court rather notes that the facts in the case at bar bear a striking similarity to those found in its decision in the matter of Tedford v. Tedford. 1994 WL 51140 (Conn. Super 1994) and finds the holding therein most persuasive.
In concluding its thoughts on this issue, the court rejects defendant's proposal that plaintiff be found to have no claim to or interest in this marital asset. To hold that a wife and mother, whose household duties and employment both continued as before after defendant left the family residence should not share in property which was either acquired by him following his separation or increased in value thereafter would be tantamount to punishing plaintiff for defendant's transgressions and rewarding defendant for his infidelity.
General Conclusion
After having reviewed and weighed all of the evidence as it relates to all of the provisions of Sec. 46b-81c C.G.S. and after having given particular consideration to such predominating factors as the length of the marriage, the comparative incomes of the parties, their relative opportunities for the future acquisition of capital assets and income, their relative contributions to the acquisition, preservative or increase in value of the marital estate and responsibility for the breakdown of the marriage, the court orders that the entire marital estate of the parties be equally divided between them, i.e.
Plaintiff 50%
Defendant 50%
IV. The Distribution of the Marital Estate of the Parties
 A. Total Marital Estate excluding stock options or rights $ 93,989 CT Page 4242 Plaintiff (wife) 50% $ 46,995 Defendant (husband) 50% $ 46,994
 Plaintiff shall take and have:
Total equity in No. 3 Westridge Drive, Simsbury, CT $ 15,639 1994 Ford Explorer (leased) — Household furniture and furnishings — Fleet partnership account 22 Two custodial accounts for children ($5,000 C.D. each) — Galaxy Fund $ 2,044 Life Insurance Work Ins. F.V. $15,000 C.S.V. 0 — Life Insurance Mass. Mutual F.V. $25,000 C.S.V. $3,000 $ 3,000 Pershing Keough, Robt. Livingston, Tr'ee 37,333 ---------- Total $ 58,038 Less amount due defendant — 11,043 ---------- Balance due plaintiff $ 46,995
Defendant shall take and have:
Household furniture and furnishings — National Bank C/A $ 1,500 Life Insurance Mass. Mutual F.V. $500,000 C.S.V. 0 — Life Insurance Principal F.V. $25,000 C.S.V. 0 — 401K Apex Data $ 22,500 I.R.A. 11,951 Amount due from plaintiff 11,043 ---------- Total due defendant $ 46,994
 B. The Distribution of Stock Rights or Options of Defendant
It is ordered that the parties share equally in any and all rights or options the defendant presently has in the acquisition of stock of defendant's employer, i.e. Smart Modular Technologies, Inc., CA. CT Page 4243
In making this equal distribution it is the intent of the court that the parties also share equally any costs or expenses incurred in exercising this option. In particular the court is mindful that defendant has in the past executed his promissory note to his employer in the amount of $60,000 bearing interest at the rate of 5.6% percent per annum as a means of exercising this option.
Lastly, it is noted that 72,832 shares of stock of defendant's employer are presently under option to him and have a present value of $1,274,560.
V. Supplemental Orders Relating to the Distribution of theMarital Estate
A. Defendant shall forthwith quit claim to plaintiff all of his interest in No. 3 Westridge Drive, Simsbury, CT. Plaintiff in turn shall hold defendant harmless with regard to the mortgage and any other encumbrances on said premises.
B. Simultaneous therewith plaintiff shall execute her unsecured promissory note to defendant in the amount of $4,543 ($11,043 — $6,500 arrearage) bearing interest at the rate of six per cent per annum and payable to defendant thirty days following the final distributions of defendant's stock rights or options in accordance with the orders of this court. VI. Orders Concerning the Minor Children
VI. Orders Concerning the Minor Children
A. The parties shall have joint custody of their two minor children. Primary physical custody of their daughter Lauren shall be with plaintiff while primary physical custody of their son Colin shall be with defendant. Each party shall have liberal rights of visitation with the child not residing with that party.
B. The defendant in this split custody situation is ordered to pay plaintiff as support for the minor child Lauren the sum of $245 per week.
C. The defendant shall maintain health insurance coverage for the benefit of both minor children. The parties shall share equally all unreimbursed medical, dental, opthomological, orthodontic or pharmaceutical expenses. The provisions of § CT Page 4244 46b-84d C.G.S., shall apply.
D. Plaintiff shall continue to maintain her present two life insurance policies during the minority of her two children with said children as irrevocable beneficiaries.
Defendant shall in turn continue to maintain his present Mass. Mutual Life Insurance policy in the face amount of $500,000 with each of the minor children as a irrevocable beneficiary in the amount of $125,000 during his or her minority.
E. Each party shall be entitled to take as a deduction for federal and state income tax purposes the minor child whose primary residence is with that party.
F. The stipulation of the parties that they will keep each other informed concerning the health and education of their children is hereby made an order of this court.
VII. Orders Concerning the Plaintiff
A. Alimony
Defendant shall pay plaintiff as alimony the sum of $550 per week until August 19, 2005 at which time daughter Lauren shall have reached the age of 18.
This order shall be nonmodifiable as to term only, but shall sooner terminate upon the remarriage of the plaintiff or upon the death of either party. Said order shall also be suspended, reduced or terminated at the discretion of the court, as provided in Sec. 46b-86b C.G.S.
In making the above orders, the court has considered all of the provisions of Sec. 46b-82 C.G.S. including the awards it has previously made pursuant to Sec. 46b-81 C.G.S.
B. Insurance
Defendant shall continue to maintain his present Mass. Mutual Life Insurance Co. policy in the face amount of $500,000 with plaintiff as irrevocable beneficiary in the amount of $250,000 during such time as defendant shall be obligated to pay alimony to plaintiff (on this regard see also Article VI D. CT Page 4245
C. Health Insurance
Defendant shall construe to maintain plaintiff on his present health insurance policy for the maximum period prescribed by law but at plaintiff's cost and expense.
VIII. Other Orders
A. Because of the financial orders previously made, the court will make no award of counsel fees to either party.
B. Each of the parties shall be solely responsible for all debts listed on his or her financial affidavit.
C. Each party shall execute all documents necessary to carry out the order of this court.
D. During such times as defendant shall be required to pay alimony or support, the parties shall annually, commencing April 15, 1997, exchange federal income tax returns.
E. The restraining order entered by Hon. Paul Sullivan on April 23, 1995 is ordered continued until such time as the parties have fully complied with all orders of this court relating to the distribution of the marital estate.
F. Each party shall be entitled to retain all personal property presently in his or her possession.
G. Plaintiff claims from defendant an arrearage of $9,996 including one half of a $2,000 bonus received by defendant. Defendant concedes an arrearage of $5,500 and also admits owing plaintiff one half of that bonus. The court has found it difficult to either locate or interpret the various court orders referred to by counsel. Further, its extensive trial notes shed little light on this issue. The memoranda of counsel also offer little assistance. The court determines that defendant owes plaintiff a total of $6,500 in unallocated support and bonus proceeds. This amount may be utilized to reduce plaintiff's debt to defendant when the marital estate is divided in accordance with the provisions of Article V supra.
By the Court
John D. Brennan CT Page 4246
State Judge Referee